UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CLIFTON A. GABAREE, JR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 13-0206-CV-W-ODS |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART PETITION FOR HABEAS CORPUS AND (2) DENYING ISSUANCE OF A CERTIFICATE OF APPEALABILITY**

Pending is a Petition for Writ of Habeas Corpus filed by Clifton Gabaree pursuant to 28 U.S.C. § 2254. For the following reasons, the motion (Doc. # 1) is granted in part and denied in part. Furthermore, to the extent the motion is denied, the Court grants in part a Certificate of Appealability.

I. BACKGROUND

A. Summary

Petitioner was convicted in Missouri state court on three counts of statutory sodomy in the first degree, three counts of child molestation in the first degree, and six counts of child abuse. He was first convicted in 1998 and the convictions were affirmed on direct appeal. The state trial court granted Petitioner's motion for postconviction relief after concluding his trial counsel provided ineffective assistance in failing to lay the foundation for certain impeachment of the victims, thereby forfeiting the ability to conduct the impeachment in question. Petitioner's second trial took place in March 2003; he was again convicted on all twelve counts and his conviction was affirmed on direct appeal. State v. Gabaree, 164 S.W.3d 32 (Mo. Ct. App. 2005). Petitioner sought postconviction relief which was denied; however, the denial was reversed when the

Missouri Court of Appeals held the trial court erred by summarily denying the motion without conducting a hearing. Gabaree v. State, 290 S.W.3d 175 (Mo. Ct. App. 2009). The trial court held a hearing and denied the motion for postconviction relief; this denial was affirmed. Gabaree v. State, 363 S.W.3d 113 (Mo. Ct. App. 2012).

## B. General Factual and Procedural History

The factual background to this matter was summarized by the Missouri Court of Appeal in its 2009 decision:

> In 1992, [Petitioner] began living with K.S. who had two daughters, B.S. and A.S. [Petitioner] and K.S. later had two children together, a daughter M.G. and a son B.G. In [May] 1996, DFS received statements from five-year old B.S., four-year old A.S., and two-year old M.G. that [Petitioner] was physically abusing them and sixteen-month old B.G. The children had marks, burns, and bruises consistent with the physical abuse they described; they were dirty and covered with untreated scratches and scrapes. Dr. James Kelly examined all of them and determined that the bruises and marks on B.S., A.S., and M.G. were consistent with intentional infliction. The DFS worker interviewed the live-in paternal grandmother who informed the DFS worker that she witnessed her son [Petitioner] physically abuse the children. After K.S. declined family preservation services, the children were placed in foster care. [Petitioner] submitted to a psychological evaluation performed by Dr. Gregory Sisk at DFS's request. B.S. and A.S. were returned to K.S. after she and [Petitioner] ended their relationship.
>
> In December 1996, six-year old B.S. told a DFS worker that [Petitioner] put his "thingy" and finger inside of her bottom "a long time ago," when she was three years old. She also stated that she observed [Petitioner] doing something to A.S. The DFS worker then interviewed five-year old A.S., who stated that neither [Petitioner] nor anyone else had given her or her sister a bad touch. She also stated that she no longer loved [Petitioner]. B.S. later told her mother K.S. that [Petitioner] would stick his "thingy" in her "butt" more than once and "had the 's' word with her" using lotion or cream while K.S. was at work. A.S. told her mother that [Petitioner] played with her privates with Q-Tips when she and the other children were playing hide-and-go seek with him.
>
> The girls provided statements during videotaped interviews at the Child Protection Center (CPC). B.S. retold the interviewer what she previously had told the DFS worker and K.S. including the statement that [Petitioner]

2

put his "private" in A.S.'s "back private." Additionally, she stated that [Petitioner] put his finger in her front private and made her "suck his private." A.S. told the interviewer that [Petitioner] touched her "butt" and "pee pee" with a belt and his hand. Subsequently in February 1997, Dr. Barbara Allphin performed Sexual Abuse Forensic Examination (SAFE) exams on each child for physical evidence of sexual abuse, but none was found.

[Petitioner] was arrested. During interrogation, he denied physically or sexually abusing the children. He stated that the children probably were confused because when they were younger he would bathe with them and probably had an erection. He wrote an apology letter to the girls providing them with this explanation. [Petitioner] was charged with three counts of first-degree statutory sodomy, three counts of first-degree child molestation, and six counts of abuse of a child.

A jury trial occurred in 1998. As to the sexual abuse allegation, B.S. testified that [Petitioner] did sex with his "thingy" in her bottom and A.S.'s bottom. She observed him touching A.S.'s bottom with his "thingy" through a glass door. She specifically denied that he touched any other parts of her body, that he had her touch any other parts of his body, or that he asked her to do anything with her mouth. She testified that she was telling the truth when she spoke to the DFS caseworker and admitted that she probably remembered more at that time than she did at the time of her testimony. A.S. testified that [Petitioner] gave her a "bad touch" because he "did sex" to her but did not explain the latter phrase when asked, and that he touched her "privates" with his hands. After being shown a diagram, she testified that [Petitioner] touched her "vagina" with his penis. She also denied any bad touch occurring in the bathtub and stated that [Petitioner] used Q-Tips to touch her bottom.

[Petitioner] claimed that the children were making false allegations because K.S. was bitter about their break-up. [Petitioner] testified that he did not molest the children but he, K.S., and the children bathed together because it was K.S.'s idea of family bonding. He also stated that he bathed the girls without K.S. present and would have them sit on his upper and lower leg to clean them, as if K.S. were still in the bath tub. He also testified that he did not abuse the children but spanked them with a belt to discipline them for misbehavior that endangered them or their siblings' lives.

He also presented testimony from his family and Ms. Tonya Young, a former girlfriend. Two of his sisters testified that they did not witness [Petitioner] abuse the children. One of the sisters testified that she did not notice bruises. The other sister testified that she noticed bruises when the children, [Petitioner], and K.S. lived with her and her mother, but she did

3

not consider them signs of abuse. She also testified that she observed
her brother bathing the children in the tub by themselves and believed it
would not be normal for her brother to be naked in the tub with them.
[Petitioner's] mother testified that she did not observe any abuse and
denied telling a DFS worker that her son had physically abused the
children.

Ms. Young testified that she did not notice any abuse when K.S. and the
two girls lived with her in December 1996, which was after her relationship
had ended with [Petitioner]. Defense counsel attempted to solicit
statements from Ms. Young that the girls recanted the sexual abuse
allegations to her in February 1997. But the prosecutor objected, claiming
it was improper impeachment because defense counsel had not
confronted the girls with their statements to Ms. Young. The trial court
sustained the objection, and Ms. Young testified about the girls'
recantations during an offer of proof.

290 S.W.3d at 177-78. As noted earlier, Petitioner was convicted on all twelve counts and the convictions were affirmed. However, the trial court granted Petitioner's postconviction motion after concluding trial counsel was ineffective for failing to lay the foundation necessary to permit eliciting Young's testimony. In assessing the effect of trial counsel's error, the trial court observed "[t]he State's evidence in the criminal case was not overwhelming. The girls' live testimony differed from their videotaped statements. The length of the deliberations and the questions the jury asked suggests they were not easily convinced of the Movant's guilt." Gabaree v. State, No. 00-CV-208841, slip op. at 6 (Mo. Cir. Ct. Jan. 16, 2002) (Respondent's Supplemental Exhibit 1).

In 2003, [Petitioner] had another jury trial. All the State's witnesses from
the first trial, except for Dr. Allphin, testified at the second trial. Dr. Allphin
could not attend, so Dr. Kelly testified about the SAFE exam based on her
report. As to the sexual allegations, B.S. testified that when she was
between three and seven years old, [Petitioner] had sex with her by
putting his penis in her butt and vagina, which "felt like being in hell." He
also touched her anus and vagina with his hand and forced her to "suck
his penis." B.S. also testified that she saw [Petitioner] have sex with A.S.
A.S. testified that she remembered that [Petitioner] touched her "private
part" with his hands and stated that her old drawing of his private part and
her private part depicted what he would use on her sometime.

Again, [Petitioner] testified in his defense that he did not physically abuse
or sexually abuse the children. He admitted to disciplining the children

4

and to bathing with the girls and washing them with his bare hands. A different sister testified that she did not observe any abuse or bruises on the children. Ms. Young's testimony provided during the offer of proof concerning the girls' alleged recantations from the first trial was read into evidence.

Gabaree, 290 S.W.3d at 179-80. Petitioner was again convicted on all twelve counts. The convictions were affirmed on appeal.[1]

### C. Dr. Kelly and Dr. Sisk

The issues the Court deems most crucial – and the issues that justify granting the writ – relate to the testimony of Dr. Kelly and Dr. Sisk. Therefore, further details about their testimony are set forth here.

#### *1. Dr. Kelly's Testimony*

Dr. Kelly examined B.S., A.S. and M.G. in May 1996. T.Tr. at 390.[2] This would have placed the examination after the reports of physical (non-sexual) abuse but before the reports of sexual abuse. Dr. Kelly discussed the results of his examination and the reasons why the injuries he saw constituted burns, the aftereffects of having been struck with a belt and belt buckle, and other intentionally inflicted injuries. T.Tr. at 399-400, 404-05, 408-09, 417. This examination was Dr. Kelly's last contact with the girls. T.Tr. at 417.

As noted by the Missouri Court of Appeals (and as reflected in the trial transcript) Dr. Kelly then testified about the results of the SAFE exam conducted by Dr. Barbara Allphin nine months later – after the reports of sexual abuse were made. As noted, Dr. Kelly did not examine or otherwise interact with the girls on this occasion. Nonetheless,

---

[1] Having Dr. Kelly testify about Dr. Allphin's report and conclusions presents potential Confrontation Clause issues. However, these issues have not been raised by the parties, so the Court does not address them.

[2] "T.Tr. at ___" is a reference to the transcript from the second trial, which commenced on March 17, 2003.

5

Dr. Kelly was permitted to testify about Dr. Allphin's findings that there were no significant injuries in the girls' genital or anal areas, but that such findings were not surprising given the passage of time and the capacity of the body to heal. T.Tr. at 420, 424-25, 426. Near the end of Dr. Kelly's direct testimony, however, the following exchange occurred:

> Q: Based on the history that these girls provided to Dr. Allphin and the exam that she did, the S[AFE] exam form that you are familiar with, would you say their exams were consistent with sexual abuse?
>
> A: It's based primarily on disclosure, given the interview process and they had very, very specific disclosure, description, a very consistent disclosure. And I found it a very credible disclosure from both of them.

T.Tr. at 425-26.

### *2. Dr. Sisk's Testimony*

Dr. Sisk interviewed Petitioner on a referral from DFS in August 1996. T.Tr. at 545. This interview occurred before the reports of sexual abuse occurred, and there is no indication Dr. Sisk interviewed Petitioner thereafter. In his testimony, Dr. Sisk explained that he administered psychological tests he described as indicating "whether or not they have beliefs that would underlie abuse or neglect. So that it gives scores in four areas, in particular, that I think a parent has beliefs that would lead to abuse or neglect." T.Tr. at 552. He then summarized Petitioner's results as "saying he holds beliefs that have a potential there to lead to physical abuse or neglective care" because of results on a test that "measures how much a parent believes that the children are supposed to take care of them." Id. The prosecutor then asked if that would "include sexual needs" and Dr. Sisk stated "[i]t could, yes." Id. Near the end of the direct examination, the following exchange occurred:

6

> Q: After the interview and evaluation of his test scores, did you reach a conclusion about the defendant's parenting ability?
>
> A: Yes. *I thought that he was holding onto parenting beliefs that contributed to abuse and neglect* and that he needed to be participating in some sort of treatment program to remedy that, to correct those beliefs.

T.Tr. at 554 (emphasis supplied).

Instead of objecting to any of this testimony regarding Petitioner's propensity to abuse children, Petitioner's trial counsel attempted to repair the damage during cross examination. The effort failed, as it resulted in more evidence about Petitioner's propensity and Dr. Sisk's conclusion that Petitioner probably abused the children:

> Q: Does scoring low in those areas mean that you're going to go out and abuse somebody?
>
> A: Well, I think it identifies beliefs that underlie, yes, abuse and neglect.
>
> Q: Does everybody that scores low on that abuse somebody?
>
> A: Well, I suppose, you know, certainly there are norms for that, to give it to adolescents in the family to see if their perception of parenting is abusive. So, no, *the answer to that would be a person could harbor beliefs about child rearing, yet never be a parent and still hold beliefs that could be abusive if they ever became a parent.*
>
> So it doesn't say that everybody who takes the questionnaire is necessarily doing that, but rather holds those beliefs, those underlying beliefs.
>
> Q: Does everybody who – Do you believe just because somebody would score low on these tests that that means that person is going to abuse a child?
>
> A: No. I mean, certainly people could take it that have no children so, right there, that wouldn't have anything to do with it. *What it would say is that if a person, you know, had children and came out with these scores, yes, they're probably abusing or neglecting the children if they're acting on those beliefs.*

7

> Q: Well, who says that because he takes this test and scores this way that he's going to be acting on these beliefs?
>
> A: If you're a parent and those are the beliefs that you hold, I guess, *there's the assumption made that you're operating as a parent under those beliefs and you're actually doing it. I don't know how someone would approach the questionnaire and start writing down beliefs that were abusive but, yet, in practice, were not doing those.*

T.Tr. at 557-58 (emphasis supplied).

The prosecution relied on the aforementioned testimony in closing. In the first part of closing, the prosecutor reminded the jury that Dr. Sisk "told you about the *defendant's propensity toward violence*, he broke a wall, broke his knuckle into the wall. He blamed others constantly. He had blurred boundaries, *would use children to satisfy his own needs, including sexual needs.*" T.Tr. at 731 (emphasis supplied). In the rebuttal portion of the closing, the prosecutor argued as follows:

> [T]his child has to all the experts in the field, Dr. Kelly, who read her disclosure; her CPC transcript to Julie Donelon who interviewed her; to Scott morgan who interviewed her; *she has been found credible, believable, and consistent.* And why? Because it happened. *Because those people know, they have talked to hundreds and hundreds of abuse victims, and they've talked to some who weren't. So they know what a does a child tell you.* [sic] They know what they feel.

T.Tr. at 746.

During her closing argument, Petitioner's trial counsel did not mention Dr. Kelly or Dr. Sisk by name, nor did she address (1) their opinions about the victims' veracity or the Petitioner's propensity to commit crimes (2) the prosecutor's arguments regarding that testimony. T.Tr. at 733-42.

As noted earlier, Petitioner was convicted on all twelve counts. He was sentenced to life imprisonment on each sodomy count, seven years imprisonment on each molestation count, seven years on four of the child abuse counts, and five years on two of the child abuse counts. The sentences were to be served concurrently.

On direct appeal Petitioner's first two arguments contended the trial court erred in failing to *sua sponte* exclude (1) the testimony of Dr. Sisk for testifying Petitioner had a propensity for physically and sexually abusing children and (2) the testimony of Dr. Kelly

for testifying that he found the victims' reports to be credible. The memorandum accompanying the Missouri Court of Appeals' affirmance explains that the issues were not preserved for review because Petitioner's attorney did not object, and the court declined to engage in plain error review. Respondent's Supplemental Exhibit 5.

### 3. Postconviction Proceedings

Petitioner raised four issues in his state postconvicton proceeding, all of which asserted trial counsel provided ineffective assistance. The grounds were: (1) counsel failed to object and request a mistrial in response to Dr. Kelly's testimony, (2) counsel failed to object and request a mistrial in response to Dr. Sisk's testimony about Petitioner's propensity to physically and sexually abuse children, (3) counsel failed to request a mistrial when Dr. Sisk testified about Petitioner breaking a knuckle when he punched a wall during an argument with the victims' mother, and (4) counsel failed to impeach B.S. with her prior trial testimony and deposition testimony. As noted earlier, these claims were initially rejected without a hearing, but that decision was reversed after the Missouri Court of Appeals held that a hearing was required. Petitioner's arguments were rejected after a hearing, and the denial of postconviction relief was affirmed on appeal. Grounds (1), (2), and (4) are the only issues raised in this proceeding.

Petitioner's trial attorney testified that she did not remember anything about this case. In addition to the passage of time – the trial occurred in March 2003, nearly seven years before the postconviction hearing – counsel explained that she had three or four cases similar to this one around the same time period, and two of them (this one and one other) were pending in front of the same judge. In the intervening years, counsel has maintained a regular open caseload of approximately 150 cases, and has had numerous cases with similar fact patterns and charges. Consequently, she found it difficult to remember the details of this particular trial. P.Tr. at 12-13, 16.[3]

---

[3]"P.Tr. at ___" is a reference to the transcript of the hearing in the postconviction proceeding held on February 9, 2010.

During the hearing counsel was asked about Dr. Kelly's testimony. She testified she had no independent recollection of anything untoward about his testimony. P.Tr. at 20.[4] She also testified that she did not recall the specifics of Dr. Sisk's testimony. P.Tr. at 22. She acknowledged that "witnesses aren't allowed to comment on the veracity of other witnesses" and generally are not allowed to testify as to the propensity for a defendant to commit a crime, but speculated there might be reasons why she might let such testimony (if it existed) be presented without objection. P.Tr. at 20-21. One example was if the client wanted the testimony to be presented, although she had no recollection as to whether Petitioner wanted this testimony presented. P.Tr. at 23-24.

On cross-examination, counsel talked generally about her approach to making objections. She agreed that sometimes objecting draws more attention to the objectionable testimony than the testimony itself and that sometimes "it's easier to let it go than to make a big deal and make the jury obvious [sic] that this is a problem. However, as a general rule, if it's something that is, if it is something that is really bad, I would try to object, assuming that I did actually hear it said and caught it. I am human sometimes, I don't." P.Tr. at 41-42. Counsel was then shown Dr. Kelly's testimony from page 426 of the trial transcript and – after again disclaiming any memory of the exchange – characterized his answer as non-responsive. She found this significant because this meant (1) she may have not heard the answer or (2) might have consciously opted not to object because moving to strike the answer would have called more attention to it. P.Tr. at 43-45. Finally, trial counsel was shown Dr. Sisk's testimony from pages 552 and 553 (but apparently not page 554, which contained his ultimate conclusion that Petitioner held "parenting beliefs that contributed to abuse and neglect"). P.Tr. at 45. Trial counsel then explained that she did not view it as suggesting Petitioner had a propensity to commit child abuse, did not see anything problematic about his testimony, and characterized it as simply opining that Petitioner needed parenting classes. P.Tr. at 47-48. And, as with Dr. Kelly's testimony, counsel expressed concern that objecting would have been ineffective because it would have required asking the judge to strike the testimony, thereby calling the jury's attention to it.

---

[4]Trial counsel did not represent Petitioner on direct appeal.

10

In such a case, she might elect to deal with the testimony during closing argument. P.Tr. at 49.

The Missouri Court of Appeals affirmed the trial court's denial of postconviction relief in a per curiam order. Accompanying the Order is a Memorandum Supplementing Order Affirming Judgment issued pursuant to Missouri Rule 84.16(b). With respect to Dr. Kelly's testimony, the court concluded "Missouri strictly prohibits expert evidence on witness credibility as this would invade the province of the jury. Dr. Kelly's testimony clearly improperly bolstered the credibility of the children and, upon timely objection, would have warranted exclusion from evidence at trial." Memorandum at 7 (internal quotations and citations omitted). "Dr. Sisk's testimony about [Petitioner's] beliefs constituted propensity evidence, it was not admissible[,] and would have merited exclusion from evidence upon a timely objection." Id. at 9. However, despite acknowledging the evidence was inadmissible and excludable, and despite acknowledging counsel could not remember anything about the trial the court held Plaintiff's trial attorney did not provide deficient performance because there were "strategic reasons why she *might* have chosen not to object to [Dr. Kelly's] unsolicited testimony, including not wanting to call attention to the testimony, though she also noted that she may have simply failed to notice Dr. Kelly's testimony." Memorandum at 8 (emphasis supplied). With respect to counsel's failure to object to Dr. Sisk's testimony, the court found counsel

> testified that she did not know why she failed to object to Dr. Sisk's testimony. [Counsel] did, however, identify reasons why she might have chosen not to object to Dr. Sisks's [testimony] as a matter of trial strategy. [She] testified that she ordinarily does not want the jury to know that there was a previous trial if one occurred. She stated that her impression of the testimony was that, viewed in the context of his entire testimony, Dr. Sisk was basically saying that [Petitioner] needed parenting classes in a complicated, doctor-type way. [Counsel] indicated that she may have simply decided to characterize Dr. Sisk's testimony that way in closing argument. In addition, she acknowledged that she may not have wanted to call attention to the doctor's testimony.

Memorandum at 9-10.

11

### D. Impeachment of B.S.

In addition to the issues raised regarding Dr. Kelly and Dr. Sisk, Petitioner alleges trial counsel was ineffective in failing to impeach B.S. with testimony from the first trial. In this regard, the trial transcript reflects that trial counsel impeached B.S. with numerous contradictions in her statements. In some instances the point was made during cross-examination of B.S., while in others the point was made in questions posed to other witnesses the highlighted the differences in B.S.'s accounts. The differences in these accounts formed the theme for the closing argument.

During the hearing on the postconviction motion, Petitioner's trial counsel explained determining which material used to impeach a witness depends on the circumstances. In particular, if the prior statement is worse than the testimony offered at trial, she views downside risk as greater than any potential benefit. P.Tr. at 29-30. Counsel also testified there is an additional risk when dealing with child victims because she does not want to appear to be "beating up on a little kid." P. Tr. at 33. When shown specific passages from the first trial, counsel characterized B.S.'s testimony as largely consistent with the testimony from the second trial and in some ways worse, and further explained that any differences were too easily explained based on the passage of time and B.S.'s improved command of language because she was five years older. P. Tr. at 36-37; 51-54.

In affirming the denial of postconviction relief on this ground, the Missouri Court of Appeals noted that decisions regarding whether and how to cross-examine (and impeach) a witness are matters of trial strategy. Relying on counsel's testimony summarized above, the court found counsel's actions did not constitute deficient performance. Memorandum at 10-11.

### II. DISCUSSION

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a writ of habeas corpus shall not be issued on a claim litigated on the merits in state court unless the state court's decision

12

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" provisions in the first subsection have independent meaning. The "contrary to" provision applies "if the state court arrive at a conclusion opposite to that reached by the Supreme Court on a question of law, or reached a decision contrary to Supreme Court precedent when confronting facts that were materially indistinguishable." Jackson v. Norris, 651 F.3d 923, 925 (8th Cir. 2011), cert. denied, 132 S. Ct. 1606 (2012). The "unreasonable application" clause applies "if the state court correctly identified the governing legal principle, but unreasonably applied it to the facts of the particular case." Id. With respect to the facts, AEDPA commands deference to the factual determinations of the state courts. This deference cannot be overcome simply by marshaling the contrary evidence from the Record. Resolution of factual issues often requires reconciling contrary evidence or ascertaining which of two contradictory statements to believe. Recounting contrary evidence will not automatically demonstrate a factual finding is "unreasonable . . . in light of the evidence presented in the State court proceeding."

A claim of ineffective assistance of counsel is governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995), cert. denied, 517 U.S. 1214 (1996) (quoting Lawrence v. Armontrout, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified

acts or omissions were outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Id. at 689. Assuming the performance was deficient, the prejudice prong "requires proof" that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" Lawrence, 961 F.2d at 115 (quoting Strickland, 466 U.S. at 694).

Id. Failure to satisfy both prongs is fatal to the claim. Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); see also DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000).

### A. Dr. Kelly and Dr. Sisk

The Missouri Court of Appeals correctly identified the governing legal standard. However, after reviewing the Record, the undersigned concludes the Missouri Court of Appeals' decision suffers from both an unreasonable application of Strickland and an unreasonable determination of the facts, the combination of which demonstrates Petitioner's trial counsel violated Strickland's performance prong. The Court's analysis for prejudice reveals that there is a reasonable probability the outcome would have been different but for the deficient conduct, but only with respect to the three sodomy counts and the three child molestation counts.[5]

---

[5] The Court notes Respondent's response to the Petition is rather unhelpful. It essentially contends Petitioner's arguments were rejected by the Missouri Court of Appeals . . . and that is all. There is no analysis or explanation as to why the state court's determination was reasonable; just the bare conclusory statement that the decision is "not contrary to or . . . an unreasonable application of" law. Merely calling it "reasonable" does not make it reasonable.

14

### 1. Performance Prong

At the outset, the Court notes an understandable difficulty with the Record: trial counsel did not remember the trial, and therefore could not state what strategy she had in mind (if any) when she failed to object to the testimony. This difficulty certainly does not mandate granting the writ. Certain trial strategies are understandable, common and readily apparent in a given circumstance. However, even if one accepts the strategies ascribed to counsel by the Missouri Court of Appeals, those strategies are plainly invalid under the circumstances of this case. In this regard, the Court notes that it is not enough for an attorney to "have a strategy." While case law establishes that a strategy choice by counsel is virtually unchallengeable, that strategy choice has to be valid. E.g., Thai v. Mapes, 412 F.3d 970, 978-79 (8th Cir.), cert. denied, 546 U.S. 1039 (2005) ("[Petitioner] had the burden of proving that his lawyer's performance was unreasonable under prevailing professional standards, and that his lawyer's actions were not viable trial strategy."); Snell v. Lochhart, 14 F.3d 1289, 1304 n.12 (8th Cir.), cert. denied, 513 U.S. 960 (1994) ("Because [Petitioner] has not overcome the presumption that this was a valid trial strategy, he has not established deficient performance."). This is the very essence of Strickland and subsequent Supreme Court decisions, which describe the performance prong as based upon an "*objective* standard of reasonableness." E.g., Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Thus, the law is clear: an attorney can have a sincerely-held, well-planned strategy that is so far beyond the objective standard of reasonableness – or, in other words, is so invalid – that the performance prong is violated. In this case, the state court reached an unreasonable conclusion when it found counsel's strategy was valid.

With respect to Dr. Kelly, the possibility that counsel did not hear the inadmissible testimony cannot pass the performance prong. It is doubtful that counsel had a strategy of not listening to answers, but even if she did such a strategy is patently unreasonable. The only possible strategy offered for not objecting was a desire to not call attention to the inadmissible testimony. Certainly, there are instances in which an attorney might reasonably opt not to object in order to refrain from calling attention to a piece of evidence – but this rationale makes no sense *in this context*. A desire to not highlight

improper evidence cannot be a magic talisman that insulates all decisions to refrain from objecting, and a contrary decision would permit any attorney to sit idly and allow a parade of inadmissible evidence to be presented, all in the name of preferring not to highlight it. Some impermissible evidence is of such a nature that, given the case, it cannot be reasonable strategy to do nothing.[6] Consider:

1. There was no medical evidence supporting the children's account of sexual molestation or sodomy.
2. There were no eyewitnesses except the children themselves.
3. A second trial had been ordered based on prior counsel's errors precisely because the state's case was not strong and was predicated on the believability of the victims.
4. The victims had provided conflicting and inconsistent accounts.

It is in this context that counsel purportedly chose not to object. The choice was made to allow in testimony from an expert telling the jury that, based on his expertise, the children were believable – instead of objecting and having the jury be told to disregard this highly improper evidence. If this was counsel's strategy, the Court cannot fathom how it can be deemed "reasonable" or "valid," because it allowed inadmissible testimony to tilt the balance on the central issue in the case *and* allowed the State (as it did) to invite the jury to believe the victims because experts found them to be credible.

The preceding discussion applies with even greater force with respect to Dr. Sisk's testimony. The Missouri Court of Appeals credited counsel's testimony that she would not have wanted the jury to know there had been a prior trial. Accepting for the sake of argument that this is a valid trial strategy, it serves no purpose here because counsel could have objected to Dr. Sisk's testimony that Petitioner had a propensity for abusing children *without mentioning the prior trial.* The court then credited Counsel's

---

[6]In a vastly similar case, the Eighth Circuit held Strickland's performance prong was violated when improper opinion evidence about a witness's credibility was permitted without objection (although the court also held the prejudice prong was not violated in that particular case). Olesen v. Class, 164 F.3d 1096, 1101-02 (8th Cir. 1999). The Eighth Circuit has also observed more generally that simply because a decision may be "strategic" does not mean it is "categorically" reasonable under Strickland. Becker v. Luebbers, 578 F.3d 907, 913 n.4 (8th Cir. 2009), cert. denied, 130 S. Ct. 3520 (2010).

testimony that she did not view the testimony as inadmissible and was only indicating Petitioner needed parenting classes and would have been something she chose to address in closing. There are two problems with this reasoning. First, the Court does not understand how someone could have heard the entirety of Dr. Sisk's testimony and thought it only meant to suggest Petitioner was a bad parent. Certainly, counsel's cross-examination demonstrates a different understanding. More telling is the fact that even when presented with the transcript during the postconviction hearing counsel *still* did not believe Dr. Sisk's testimony was inadmissible. This is in stark contrast with the Missouri Court of Appeals' quick and ready assessment that the testimony was inadmissible. Finally, even if counsel's belief that Dr. Sisk's testimony was benign and admissible were reasonable, she did not employ the strategy she indicated she would have utilized because she did not address Dr. Sisk's testimony in closing. Finally, the desire to refrain from highlighting the testimony was unreasonable for all the reasons mentioned with respect to Dr. Kelly. In fact, it is arguably more unreasonable given that the bulk of Dr. Sisk's testimony (on both direct and cross) expressed his opinions that

1. Petitioner had views/beliefs indicating a propensity for abusing children
2. The only people with such views/beliefs that do not abuse children are those who are not parents of children
3. People presumptively act on these views/beliefs
4. Petitioner probably acted on these beliefs.

As explained by the Missouri Court of Appeals, such evidence is inadmissible precisely because it invites the jury to make a decision based on irrelevant factors. It is an invitation to convict the defendant because of his propensity to commit crimes and not because he actually committed the crime. Memorandum at 9. Allowing *this* evidence into *this* trial out of a fear of "highlighting by objecting" was a patently unreasonable trial strategy.

### *2. Prejudice*

Neither the state trial court or appellate court addressed Strickland's performance prong. Both courts rejected Petitioner's claim based on the conclusion that trial

counsel's performance was not deficient and did not address the prejudice prong. Therefore, there is no state court decision to which this Court must defer.

As noted earlier, a defendant suffers prejudice from an attorney's deficient performance if there is a reasonable probability the outcome would have been different. After evaluating the deficiencies outlined above in the context of the entire Record, the Court concludes there is a reasonable probability the outcome of the trial would have been different with respect to the sodomy and child molestation counts. This conclusion is supported by facts mentioned in other contexts, including (1) the absence of medical evidence, (2) the absence of independent eyewitnesses, (3) the conflicts in the victims' testimony, (4) the state trial court's 2002 indication that the evidence of guilt was "not overwhelming," (5) the connection between the legal reasons why the evidence was inadmissible and the weaknesses in the state's case, and how the inadmissible evidence shored up those weaknesses, and (6) the fact that the prosecution specifically argued to the jury that it should rely on the inadmissible evidence to find that the victims were credible and that Petitioner acted on his propensities.

The Court does not believe counsel's deficient conduct prejudiced Petitioner with respect to the six child abuse counts. In contrast to the sodomy and molestation counts, there were observable signs of abuse. DFS workers saw marks left by belts and belt buckles and the aftereffects of burns. Expert testimony confirmed that these marks were consistent with belts and belt buckles and were not the product of accidental injury. Expert testimony also confirmed that other injuries were burns: some bore the tell-tale sign of being from a cigarette, and others were of the sort caused by exposure to an open flame (such as a cigarette lighter). An independent eyewitness – Petitioner's mother – reported observing Petitioner whipping the children and expressed concern. The victims' mother described observing Petitioner bending the children over his lap or a chair and whipping them with a belt. The victims' accounts of this non-sexual abuse were rather consistent. Petitioner testified that he used a belt to discipline the children (although he denied doing so as frequently or with as much force as other witnesses described). For these reasons, the Court holds counsel's failure to object to Dr. Kelly's and Dr. Sisk's impermissible expert conclusions did not have a reasonable probability of affecting the outcome on the six counts of child abuse.

18

## B. Impeachment

The Missouri Court of Appeals' concluded that trial counsel's decision regarding how to impeach B.S. constituted the exercise of reasonable trial strategy. The Court concludes the state court's application of Strickland was reasonable. As a general proposition, issues relating to how impeachment will be conducted constitute matters of trial strategy. E.g., United States v. Orr, 636 F.3d 944, 952 (8th Cir.), cert. denied, 132 S. Ct. 758 (2011). Determining the extent and basis for impeachment is a strategic decision. Here, Petitioner's trial counsel evaluated the available material and decided what to use and what not to use. In her assessment, the first trial's transcript was not as useful for impeachment purposes as the materials she actually employed. While a different attorney may have reached a different decision regarding how to impeach B.S., the decision to conduct the cross-examination in the chosen manner and eschew use of the transcript from the first trial can be reasonably described as effective assistance under Strickland. Petitioner is not entitled to relief based on trial counsel's failure to impeach B.S. with her testimony from the first trial.

## C. Certificate of Appealability

Respondent does not require a Certificate of Appealability to appeal the Court's decision. Petitioner does, however, and 28 U.S.C. § 2253(c)(2) provides that a Certificate of Appealability should be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." This requires Petitioner to demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quotation omitted).

The Court denies a Certificate of Appealability insofar as the decision in Part II.A is adverse to Petitioner; namely, the conclusion that counsel's errors regarding Dr. Kelly's and Dr. Sisk's testimony did not prejudice Petitioner with respect to the child

abuse counts. While counsel's performance violated Strickland's performance prong, reasonable jurists would agree that the physical evidence and eyewitness testimony meant Strickland's prejudice prong was not violated.

The Court also declines to issue a Certificate of Appealability with respect to Part II.B. The Court does not believe reasonable jurists would conclude that the Missouri Court of Appeals' decision regarding counsel's impeachment of B.S. was a reasonable application of Strickland.

### III. CONCLUSION

The Court grants in part and denies in part the Petition for Writ of Habeas Corpus. Specifically,

1. Counsel provided ineffective assistance in failing to object to Dr. Kelly's and Dr. Sisk's testimony, which prejudiced Petitioner with respect to the sodomy and child molestation counts.
2. Counsel's deficiencies regarding Dr. Kelly and Dr. Sisk did not prejudice Petitioner with respect to the child abuse counts, but Petitioner is granted a Certificate of Appealability on this issue.
3. Counsel did not provide ineffective assistance of counsel with respect to the impeachment of B.S., and Petitioner is not granted a Certificate of Appealability on this issue.
4. The State of Missouri shall have seventy days from the date this Order becomes final to retry Petitioner on the sodomy and child molestation counts.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: August 13, 2013        UNITED STATES DISTRICT COURT